**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0637n.06

Nos. 08-6142, 08-6543

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

**Sep 10, 2009**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| KEN HODAK, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellant, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF KENTUCKY |
| | ) | |
| MADISON CAPITAL MANAGEMENT, LLC, | ) | O P I N I O N |
| et al., | ) | |
| | ) | |
| Defendants-Appellees. | | |

BEFORE:     GILMAN and McKEAGUE, Circuit Judges; and SARGUS, District Judge.*

**McKEAGUE, Circuit Judge.** Ken Hodak was hired as CEO of United American Resources GP Services, LLC, in May 2006. In his first four months, Hodak's performance was less than satisfactory. After management came to suspect that Hodak had breached his Confidentiality Agreement by improperly disclosing to third parties UAR's pending negotiations to acquire other companies, Hodak was terminated for cause without prior notice in September 2006. Hodak commenced this action, asserting breach of contract, fraud and other claims against his former employer. UAR responded by filing counterclaims against Hodak for breach of contract and breach of fiduciary duties.

———————————

*Honorable Edmund A. Sargus, Jr., United States District Judge for the Southern District of Ohio, sitting by designation.

The district court granted UAR's motion for summary judgment on Hodak's claims, awarded UAR attorneys' fees as prevailing party on these claims, granted UAR's motion to voluntarily dismiss its counterclaims without prejudice, and denied Hodak's motion for attorneys' fees on the counterclaims. Hodak now appeals all of these rulings.

This litigation stems fundamentally from Hodak's claim that the manner in which UAR discharged him, i.e., for cause and without notice, was in breach of the Employment Agreement. The district court concluded that the asserted confidentiality breaches were "material" and therefore represented valid justification for discharge for cause. Yet, irrespective of whether the asserted confidentiality breaches represented valid justification for discharge for cause, we find insufficient record support for the district court's implicit determination that UAR treated the confidentiality breaches as material and relied on them as the actual reason for Hodak's discharge. In our opinion, the record evidence poses triable fact issues as to whether the now asserted confidentiality breaches were the actual reason for Hodak's firing, as opposed to a pretext for other reasons that did not amount to grounds for termination for cause. We therefore vacate the district court's summary judgment ruling on Hodak's breach of contract claim and vacate the district court's award of attorneys' fees and costs to UAR as prevailing party. In all other respects, the district court's rulings are affirmed.

## I. BACKGROUND

In the Spring of 2006, United American Resources GP Services, LLC ("UAR"), recruited appellant Ken Hodak initially to serve as its Chief Operating Officer and subsequently, when the position became open, as Chief Executive Officer. UAR is one of several entities whose business

plan was to create a master limited partnership of privately-owned coal companies that would eventually go public.[1] Management services were provided to UAR by Madison Capital Management, LLC, and Madison Investment Partners 24, LLC, which are also named defendants in this action. Based on representations made by UAR, Hodak left his job with National Coal Corporation, accepted the UAR CEO position, and entered into an Employment Agreement with UAR on May 12, 2006. On the same day, in a separate document, Hodak and UAR entered into a Confidentiality Agreement that prohibited Hodak from disclosing, among other things, UAR transactions and acquisitions to those not involved in those transactions.

During his first four months on the job, Hodak failed to perform up to expectations. According to Bryan Gordon, Managing Director of Madison Capital Management, LLC, and of UAR, Hodak "had overpromised and underdelivered in terms of his capabilities." Gordon explained his dissatisfaction with Hodak as follows:

> He was fired because he was completely and utterly inadequate with respect to the job he had been hired to perform. He did not achieve any of the goals or objectives or milestones which had been agreed upon over time that he would achieve. It was my feeling that his leadership skills were lacking at best, his industry instincts were unimpressive, his presence both internally and externally were appalling, his preparedness and his ability to answer questions was absolutely substandard, and I felt his judgment was poor, and he had completely and utterly lost the confidence of the people who were closest to the project on a day-to-day basis and whose counsel I respected greatly, and had no results to speak of after being teed up with a great deal of opportunity and resources, and I felt that, you know — to use an expression, I felt

---

[1]The several related companies are also named defendants in this action. These companies are United American Resources, LP; UAR GP Holdco, LLC; UAR MLP, LP; and UAR GP, LLC. The inter-relationship of these defendants is not significant in evaluating the dispositive issues presented in these consolidated appeals. Hence, the various "UAR defendants" are referred to herein simply as "UAR," the company that actually employed and terminated Hodak.

that he had overpromised and underdelivered in terms of his capabilities, and he was essentially an empty suit.

Gordon dep. pp. 100-01, ROA 1322-23. Gordon alluded to the existence of other reasons for the discharge decision, but refused to disclose them. Gordon identified these other reasons as having been the subject of discussions with counsel and therefore protected by the attorney-client privilege.

UAR Chairman of the Board Chauncey Curtz had the impression that Hodak was overwhelmed by the job. He identified two specific examples of Hodak's shortcomings. First, Hodak was unfamiliar with the due diligence review procedures he was charged with implementing. Second, Hodak over-valued reserves available to UAR for a proposed acquisition. While Gordon and Curtz had discussed their concerns with Hodak, both acknowledged they had not advised him that his job was in jeopardy prior to his discharge.

In August and September 2006, Hodak met with representatives of two heavy equipment dealers in Birmingham, Alabama. One meeting was initiated by a Komatsu equipment dealer, Tractor & Equipment Company, in relation to the status of an equipment lease it had with Tuscaloosa Resources ("TRI") and whether the lease could be assigned to UAR, which was then negotiating to acquire TRI. During the meeting, the representative of the equipment dealer asked Hodak whether UAR was also engaged in negotiations with another company, Mann Steel Products. Hodak acknowledged that UAR probably was.

The second meeting was initiated by Thompson Tractor, a Caterpillar equipment dealer that had leased equipment to Mann Steel. The Caterpillar dealer was interested in doing business with

TRI. During this meeting, Hodak confirmed that UAR was engaged in negotiations to acquire TRI, although he did not disclose any details of the negotiations.

Curtz became aware of these disclosures by Hodak shortly after they occurred. He learned about the disclosure made to the Komatsu dealer from Sam Johnson, who was also present at the meeting. Curtz learned about the disclosure made to the Caterpillar dealer in an e-mail message from Hodak himself. Curtz had continually reminded Hodak about the necessity for confidentiality—both before and after the meetings with the equipment dealers. Yet, again, Curtz did not advise Hodak that the disclosures could be considered breaches of confidentiality sufficiently serious to warrant discharge.

Curtz considered it likely that he discussed the disclosures, along with other concerns about Hodak's performance, with Gordon. It was Gordon who made the decision to discharge Hodak. The decision was communicated to Hodak by telephone by attorney Jonathan Baum on September 29, 2006. Baum advised Hodak that UAR believed it had cause for termination, as defined in the Employment Agreement, but he did not explain what this "cause" consisted of. Baum further advised that Hodak would be granted a severance allowance if he opted to resign, an offer Hodak rejected.

Shortly thereafter, Hodak was fortunate enough to be offered a position with his former employer National Coal Corporation, which he accepted on March 1, 2007. In the meantime, Hodak had filed this action in the Eastern District of Kentucky on January 10, 2007. In relevant part, the complaint asserts claims for breach of contract (for discharging Hodak without cause and without prior notice); fraud (making misrepresentations to induce him to leave National Coal and accept

employment with UAR); declaratory judgment (to the effect that the covenant not to compete included in the Employment Agreement is unenforceable because contrary to public policy), and tortious interference with contractual relations (that Gordon, in managing UAR on behalf of the Madison defendants, interfered with Hodak's employment relationship with UAR). Federal jurisdiction is premised on the parties' diversity of citizenship. UAR filed counterclaims for breach of contract and breach of fiduciary duties.

After completion of discovery, the parties filed cross-motions for summary judgment. The district court awarded summary judgment to UAR on all of Hodak's claims on August 19, 2008. The district court then granted UAR's motion to voluntarily dismiss its counterclaims without prejudice, and awarded UAR $198,026.75 in attorneys' fees and costs expended in defending against Hodak's claims. Finally, on December 18, 2008, the district court denied Hodak's motion for attorneys' fees relating to UAR's dismissed counterclaims. This appeal followed.

## II. ANALYSIS

### A. Breach of Contract

In his most important claim, Hodak alleges that UAR breached the Employment Agreement when it terminated him without cause and without the required prior notice. If UAR had "cause" to discharge as defined in the Employment Agreement, then prior notice was not required. If UAR wished to discharge Hodak for some other reason not rising to the level of "cause," then it was obliged to first give him notice and opportunity to cure the deficiency. If UAR terminated Hodak without cause and without notice, then under the terms of the Agreement, it was obliged to grant Hodak severance pay, benefits, and forgiveness of a loan that UAR had made to him. Because UAR

allegedly discharged him without cause and without notice but did not grant him any of these benefits, Hodak claims that UAR breached the Employment Agreement. The district court awarded summary judgment to UAR on this claim, concluding as a matter of law that UAR had justification to discharge Hodak for cause and was therefore not required to give Hodak prior notice or the severance pay, benefits, and loan forgiveness.

We review de novo an order granting summary judgment. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 389 (6th Cir. 2008). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *White*, 533 F.3d at 390. Not just any alleged factual dispute between the parties will defeat an otherwise properly supported motion for summary judgment; the dispute must present a *genuine* issue of *material* fact. *Id.* A dispute is "genuine" only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party. *Niemi v. NHK Spring Co., Ltd.*, 543 F.3d 294, 298 (6th Cir. 2008). A factual dispute concerns a "material" fact only if its resolution might affect the outcome of the suit under the governing substantive law. *Id.* at 298-99.

Under the Employment Agreement, UAR was entitled to terminate Hodak immediately for any reason coming within the terms of Paragraph 9(a) defining "cause." The district court determined that the evidence established cause for discharge under ¶ 9(a)(2)(v), which provides:

> The Company may terminate Executive's employment under this Agreement at any time as follows:
>
> . . . .
>
> (2) immediately upon the showing of Cause. For purposes of this Agreement, "Cause" shall mean:
>
> . . . .
>
> (v) *a material breach of this Agreement,* which breach is not cured by Executive within 10 calendar days of receiving notice from the Company of such breach, *or the Confidentiality Agreement executed by Executive*; . . . .

Employment Agreement pp. 8-9, ¶ 9(a), ROA 91-92 (emphasis added).

Under ¶ 9(a), certain "cause" provisions require prior notice of termination and others do not. While the record contains evidence of various performance deficiencies, which may or may not have amounted to cause for discharge requiring prior notice, the district court held UAR's immediate termination of Hodak for cause was justified based on ¶ 9(a)(2)(v), because Hodak committed "a material breach of . . . the Confidentiality Agreement executed by the Executive."

The so-called Confidentiality Agreement is part of a six-page document entitled "Non-Competition, Confidential Information and Invention Agreement," executed by the parties in conjunction with the Employment Agreement on May 12, 2006. In relevant part, it states that "the Employee will not at any time. . . disclose to anyone any 'Confidential Information,' or utilize any 'Confidential Information' for the Employee's own benefit, or for the benefit of any third party other than in connection with the performance of the Employee's authorized activities for the Company." Confidentiality Agreement p. 2, ¶ 2, ROA 98. In relevant part, "Confidential Information" includes:

> all plans, manuals, programs, procedures, techniques, processes, and other information concerning: . . . plans of any kind, including, without limitation, strategic, short-term, litigation related, marketing and transaction related plans; . . . persons who have or have had relations with the Company, including past, existing or prospective business contacts with the Company . . . ; identification of the type, amount, terms or any characteristic of any investment that is or has been under consideration by the Company. . . , including any and all information regarding the underwriting, valuation, holding periods, pricing, acquisition, disposition or management of such investment.

*Id.* at pp. 2-3, ¶ 3, ROA 98-99.

Applying a standard which both sides have accepted, the district court observed that a material breach exists where a party "fails to perform a substantial part of the contract or one or more of its essential terms or conditions, the breach substantially defeats the contract's purpose, or the breach is such that upon a reasonable interpretation of the contract, the parties considered the breach as vital to the existence of the contract," citing 23 Williston on Contracts § 63.3 (4th ed.). Memorandum Opinion p. 12 n.2, ROA 1913. The determination whether a material breach has occurred is generally a question of fact answered by weighing the consequences of the breach in light of the customs of performance attendant to similar contracts. Williston at § 63.3. Yet, the district court held, based on what it termed "the undisputed evidence presented by the parties," that Hodak materially breached the Confidentiality Agreement at least twice, by disclosing transaction-related plans under consideration by UAR in conversations with the Birmingham equipment dealers, thereby "providing more than enough 'cause' for his immediate termination." Memorandum Opinion pp. 11-12, ROA 1912-13.

Hodak contends that he did not breach confidentiality at the meetings with the Birmingham equipment dealers. He maintains that when the dealers asked him about negotiations, he did not

reveal anything private or confidential about what UAR was doing. Hodak argues that his disclosures of the mere fact of UAR's ongoing negotiations with acquisition targets, without disclosing their details or status, hardly amounts to a material breach. He contends that the mere fact of negotiations was information available in the "public domain" that is excluded from the definition of confidential information in the first place. Hodak's only factual support for this argument, however, is vague testimony of Tab Hudson to the effect that people involved in the family-owned Alabama coal industry "know everything that goes on." This is clearly insufficient to create a genuine fact issue regarding the applicability of the public-domain exception.

Second, Hodak contends the disclosures were not material breaches of confidentiality because there is no evidence that they adversely affected UAR's efforts to acquire TRI or Mann Steel. Indeed, in determining the materiality of the breaches, we may consider the extent to which the injured party, UAR, was deprived of the benefit it reasonably expected. Williston at § 63.3. UAR has not presented evidence of any injury, but argues it does not matter. UAR maintains that irrespective of the limited amount of information disclosed, it is sufficient to show that Hodak did disclose information relating to UAR's acquisition negotiations with TRI and Mann Steel to third parties, in violation of the Confidentiality Agreement.

To be sure, UAR cannot be deemed impotent to discipline an employee for a breach of confidentiality unless and until the breach results in substantial harm. Hodak did what he was prohibited from doing under the Confidentiality Agreement: he disclosed confidential information. By failing to maintain confidentiality on two occasions, Hodak arguably failed to perform a substantial part of the contract. Yet, determining whether the breaches justified termination, rather

than some lesser discipline, under the terms of the Employment Agreement, requires a finding that the breaches were or were not material. And this determination would ordinarily entail some inquiry into the significance or impact of the breaches. UAR's argument that *any* confidentiality breach, no matter how trivial or insignificant, warrants discharge for cause impermissibly reads the "material breach" requirement right out of ¶ 9(a)(2)(v).

Viewing the record in the light most favorable to Hodak leads us to conclude that genuine issues of material fact remain. The parties have devoted most of their energies to arguments over the question whether the two identified disclosures were material breaches. Yet, even assuming Hodak's apparently innocuous disclosures could be considered material breaches, a triable fact question clearly remains as to whether UAR actually discharged Hodak because of the confidentiality breaches. In this specific regard, testimony from both of UAR's lead decision makers is conspicuously devoid of evidence that they believed the confidentiality breaches were either material or grounds for discharge for cause.

First, although Chauncey Curtz had ongoing discussions with Hodak about his performance as CEO and had repeatedly cautioned him about the need to maintain confidentiality, he was not alarmed or overly concerned when he learned of the disclosures Hodak made to the equipment dealers. Curtz did not remember specifically speaking to Hodak about the disclosures as breaches of confidentiality, much less as dischargeable offenses.

Second, when Managing Director Bryan Gordon was asked to explain the reasons behind his decision to discharge Hodak, he did not even mention the asserted confidentiality breaches. He was quick and definite in reciting a list of other reasons for firing Hodak, but assiduously avoided any

mention of the confidentiality breaches, claiming attorney-client privilege. Any other unmentioned, unidentified reason for Hodak's discharge, he ascribed to attorney Jonathan Baum. Baum's deposition testimony, in turn, reveals nothing about the confidentiality breaches as a reason for Hodak's discharge. Baum said the discharge decision was made by Gordon and Curtz.

In other words, there is no factual support for a finding that the confidentiality breaches, whether material or not, were the actual reason for Hodak's discharge for cause. On the present record, we conclude that there are genuine issues of fact as to whether Hodak's apparently innocuous disclosures to the equipment dealers were material and were the actual grounds for immediate termination for cause. UAR contends that Hodak's confidentiality breaches were material, and material breaches justify termination for cause. But UAR makes this argument (a) without presenting any evidence to support the finding that the breaches were material enough in the minds of its decision makers to actually motivate the discharge decision; and (b) in the face of evidence from its own representatives that other reasons actually motivated the discharge decision.

Unless UAR had a bona fide reason for terminating for cause, it was obliged to give Hodak notice and opportunity to cure prior to discharging him. Because UAR clearly did not give Hodak such prior notice, and because the record evidence gives rise to questions of fact as to whether UAR discharged Hodak because of the two cited confidentiality breaches (i.e., for a reason amounting to cause), the award of summary judgment to UAR on Hodak's breach of contract claim must be vacated.[2]

---

[2]UAR might have attempted to justify its decision to discharge Hodak by relying on the "after acquired evidence doctrine." That is, UAR might have argued that, even though it did not

### B.  Fraud

Hodak's fraud claim is based on the theory that he was induced to leave his employment with National Coal Corporation because of fraudulent misrepresentations by Bryan Gordon.  Hodak relies on three assurances made to him by Gordon:  (1) that "we're here to stay in the coal business;" (2) that "we've got money to back up the deals;" and (3) that if UAR did not succeed, Madison would continue to employ Hodak in another capacity.  The district court granted UAR's motion for summary judgment on this claim because Hodak could not satisfy all essential elements of the fraud claim.  Particularly, Hodak was deemed not to have produced any evidence that the statements Gordon made were representations of fact known by Gordon to be false when made.

The parties do not dispute the correctness of the legal standard employed by the district court:

> At common law in Kentucky, a plaintiff may demonstrate fraud by showing, with clear and convincing evidence, that a defendant "a) made a material misrepresentation, b) which was false; c) which was known to be false or made recklessly; d) which was made with inducement to be acted upon; e) which plaintiff acted in reliance upon; and f) which caused plaintiff injury." *Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc.*, 113 S.W.3d 636, 640 (Ky. Ct. App. 2003).

---

actually rely on the confidentiality breaches as grounds for discharge at the time of discharge, it could have done so and is entitled to rely on them now in defense of Hodak's breach of contract claim.  To properly invoke the defense, however, UAR would have to show that it discovered the confidentiality breaches only after Hodak was discharged, and that the confidentiality breaches were of such seriousness that they would in fact have led to Hodak's termination.  *See Brooks v. Lexington-Fayette Urban County Housing Auth.*, 134 S.W.3d 790, 806 (Ky. 2004).  Neither of these elements is made out in the present record.  The record is clear that both Curtz and Gordon were aware of the confidentiality breaches prior to Hodak's discharge and there is no evidence that either of them deemed the confidentiality breaches to be serious enough to warrant discharge.  Hence, the after acquired evidence doctrine, if asserted, would have been unavailing.

Memorandum Opinion at 15-16, ROA 1916-17. The district court construed the asserted representations by Gordon as mere opinions or predictions of future events, which are not actionable as fraud. *See Radioshack Corp. v. ComSmart, Inc.*, 222 S.W.3d 256, 262 (Ky. Ct. App. 2008). Although Hodak quarrels with the district court's characterization of the representations made by Gordon, he has yet to identify any evidence, much less clear and convincing evidence, substantiating Gordon's alleged knowledge that the statements were false when made. Absent such evidence, he clearly cannot sustain the fraud claim.

Accordingly, we affirm the district court's award of summary judgment to UAR on the fraud claim.

### C. Non-Competition Agreement

The document heretofore referred to as the Confidentiality Agreement also includes a Non-Competition Agreement, whereby Hodak agreed not to be employed by any competing entity in the coal industry for at least twelve months following his separation from UAR. In Count III of his complaint, Hodak prays for a declaratory judgment to the effect that this part of the agreement is overly broad and unenforceable because it is contrary to Kentucky public policy.

When the complaint was filed on January 10, 2007, within months after Hodak was discharged, the Non-Competition Agreement was undoubtedly of real concern to Hodak—especially as he contemplated the possibility of returning to work with National Coal. By January 29, 2007, however, UAR had agreed to waive enforcement of the Non-Competition Agreement so that Hodak could return to work with National Coal, effective March 1, 2007. Hence, the district court granted

summary judgment to UAR for lack of evidence that enforcement of the Non-Competition Agreement caused any injury to Hodak.

In challenging this ruling on appeal, Hodak argues perfunctorily that he was "clearly injured" by the wrongful discharge. Appellate review of such an undeveloped argument, adverted to only in a perfunctory manner, is properly deemed forfeited. *United States v. Hall*, 549 F.3d 1033, 1042 (6th Cir. 2008). Moreover, the "clear injury" claimed by Hodak stems from UAR's actions in discharging him in alleged breach of the Employment Agreement, not enforcement of the Non-Competition Agreement. Accordingly, we find no error in the district court's summary judgment ruling on this claim, which is also affirmed.

### D. Tortious Interference with Contractual Relations

Count V of Hodak's complaint sets forth an alternative theory of relief against defendants Madison Capital Management and Madison Investment Partners 24. To the extent the Madison defendants might be deemed not liable for Hodak's wrongful discharge under the breach of contract theory because they were not Hodak's employer and not parties to the Employment Agreement, Hodak alleges the Madison defendants are liable for the injuries stemming from his wrongful discharge because of Gordon's tortious interference with Hodak's employment relationship with UAR. The district court gave this claim short shrift, concluding that because UAR was awarded summary judgment on the breach of contract claim, there was no breach of contract for which the Madison defendants could be held liable in tort.

Insofar as we vacate summary judgment in favor of defendants on Hodak's breach of contract claim, we also undermine the rationale for the district court's disposition of his tortious interference

claim. Yet, even though the breach of contract claim survives, we remain unpersuaded that Hodak's tortious interference claim should. Despite the insufficiency of the district court's rationale, we find the record to be sufficiently well developed to allow us to rule as a matter of law that Hodak cannot prevail on his tortious interference claim.

There is no dispute that Gordon made the decision to fire Hodak. Hodak is concerned that the capacity in which Gordon acted, whether on behalf of UAR or Madison Capital Management, is unclear. It does appear that Gordon acted on behalf of both companies in different respects. Yet, Hodak concedes that even if UAR were to somehow escape liability for the alleged breach of contract because Gordon's actions were taken in his capacity as an employee of Madison Capital Management rather than UAR, the Madison defendants can be held liable for Gordon's actions under the tortious interference theory only if Gordon's interference was "malicious or without justification, or [was] accomplished by some unlawful means such as fraud, deceit, or coercion." *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 487 (Ky. 1991). Hodak has failed to adduce evidence, however, to support his argument that Gordon's interference was marked by fraud, deceit or coercion.

Whether he believed he was acting on behalf of UAR or Madison, Gordon clearly and forthrightly acted as though he had the authority to fire Hodak, and Chauncey Curtz appears not to have questioned either Gordon's authority or his decision. Although, as discussed above, Gordon may have erred in his determination that Hodak's deficiencies made out cause for termination, the record hardly substantiates the charge that Gordon acted maliciously, fraudulently, deceitfully or coercively. Yes, Gordon may ultimately be found to have acted without contractual justification,

warranting relief for breach of contract. That is hardly, however, the kind of unjustified conduct required to make out a claim for tortious interference under Kentucky law. Nor is there any evidence that Gordon, whether nominally acting on behalf of UAR or Madison, actually interfered with his principal's affairs strictly as a rogue individual motivated by personal gain or animus.

In sum, the factual support for the tortious interference claim, though hardly addressed by the district court, is patently thin—no more than a mere scintilla. We therefore exercise our prerogative to affirm the district court's summary judgment ruling on this claim on alternative grounds, as both sides have had ample opportunity to brief the issue. *See Purisch v. Tennessee Tech. Univ.*, 76 F.3d 1414, 1422-23 (6th Cir. 1996).

### E. Piercing the Corporate Veil

Hodak's complaint also alleges that UAR operated as the alter ego or instrumentality of the Madison defendants, and that UAR and the Madison defendants disregarded the formalities of corporate existence in their joint venture relationship and in their employment relationship with Hodak. Accordingly, Hodak asks the court to pierce UAR's corporate veil and declare the Madison defendants liable for UAR's wrongs. The district court side-stepped the question after it disposed of the breach of contract claim as meritless. Inasmuch as we hereby reinstate the breach of contract claim for further proceedings, the question of piercing the corporate veil warrants fresh consideration. And again, although the district court did not reach the merits of the theory, we find the record and the parties' arguments sufficiently developed to enable us to rule as a matter of law.

Under Kentucky law, "the doctrine of piercing the corporate veil is recognized as being an equitable remedy, not a cause of action unto itself, which is used as a means of imposing liability."

- 17 -

*Daniels v. CDB Bell, LLC*, — S.W.3d —, 2009 WL 2059079 at *4 (Ky. Ct. App. July 17, 2009).

Ordinarily, a corporation is looked upon as a separate legal entity, for whose actions its shareholders,

officers and directors cannot be subjected to personal liability. "But when the idea of a separate legal

identity is used to justify wrong, protect fraud, or defend crime, the law will regard the corporation

as an association of persons." *Id.* at *5. In ascertaining whether the corporate form should be

disregarded and liability imposed on the corporation's owners and officers, "courts weigh various

factors, including whether the corporate form was abused and whether the form was used to

perpetrate a fraud." *Id.* at *6.

Kentucky courts are "generally reluctant to disregard the corporate entity." *Sudamax*

*Industria e Comercio de Cigarros, LTDA v. Buttes & Ashes, Inc.*, 516 F.Supp.2d 841, 847 (W.D. Ky.

2007). "The corporate veil should not be pierced unless there is (1) 'such a unity of ownership and

interest' that the separate personalities of the corporation and its owner cease to exist, and (2) 'the

facts are such that an adherence to the normal attributes . . . of separate corporate existence would

sanction a fraud or promote injustice.'" *Id.* (quoting *White v. Winchester Land Development Corp.*,

584 S.W.2d 56, 61-62 (Ky. Ct. App. 1979)).

In furtherance of his request for equitable veil-piercing relief, Hodak alleges in ¶ 7 of his

complaint that UAR is wholly owned and managed by the Madison defendants and that Gordon

acted with actual and apparent authority both for UAR and for the Madison defendants. In ¶ 11, he

alleges that UAR and the Madison defendants "are alter egos, disregarded any separation of

corporate existence, shared in a joint venture relationship with regard to the employment of Plaintiff

and otherwise mutually shared in the benefits and expenses of the employment relationship."

Consistent with these allegations, Hodak has pointed to various proofs that he says demonstrate a blurring of the lines of separate corporate existence between UAR and the Madison defendants. Defendants, in addition to vigorously defending the charge that they disregarded any formalities of corporate existence, maintain that, in any event, Hodak has not shown any abuse of the corporate form whereby he was defrauded or otherwise suffered injustice.

Indeed, the complaint is devoid of any allegation identifying how defendants' alleged abuse of the corporate form resulted in cognizable injury to Hodak.[3] The complaint includes claims for breach of contract, fraud and tortious interference, but the requisite factual support for the fraud and tortious interference claims has already been found wanting. Hence, Hodak is left to argue that it would be inequitable not to hold the Madison defendants liable for damages caused by UAR's breach of contract in wrongfully discharging him because UAR, no longer a going concern, may not be collectable. Yet, this injury proceeded directly from Hodak's contractual relationship with his employer, UAR. It has not been shown to be attributable to any use of UAR's separate legal identity by the Madison defendants to "justify wrong, protect fraud, or defend crime." *Daniels*, 2009 WL 2059079 at *5. Hodak himself, a lawyer, admitted that he is unaware of any way in which the defendants' corporate structural formation harmed him. Hodak dep. p.245, Dist. ct. dkt. no. 89, ex. 25.

---

[3]The complaint does not expressly plead a distinct claim or theory of liability for piercing UAR's corporate veil. Under Kentucky law, this pleading failure could be deemed fatal. *See Sudamax*, 516 F.Supp.2d at 847. Yet, because the parties and the lower court have proceeded as though the claim was properly presented, we proceed to evaluate the factual support for the claim.

Absent evidence of some fraud or injustice resulting directly from the abuse of the corporate form, "the specific, unusual circumstances" necessary to justify piercing the corporate veil are lacking. *White*, 584 S.W.2d at 61; *Daniels*, 2009 WL 2059079 at *5. The corporate veil may not be pierced without a showing of injury caused by fraud or injustice separate and apart from the defendant corporation's inability to pay its debt. *Sudamax*, 516 F.Supp.2d at 849. Because the instant record is devoid of evidence supporting this essential element of Hodak's veil-piercing theory, we conclude there is no genuine issue of material fact. We therefore uphold the district court's award of summary judgment in this respect, albeit on different reasoning.

**F. Award of Attorneys' Fees to UAR as Prevailing Party**

The Confidentiality Agreement between Hodak and UAR includes provision for mandatory recovery of actual and reasonable attorneys' fees and costs by the prevailing party in "any litigation or proceeding concerning any provision of the Agreement." After the summary judgment ruling below, UAR moved for enforcement of this provision and was awarded attorneys' fees and costs in the total amount of $198,026.75. The district court held that two of Hodak's claims, the Count II breach of contract claim and the Count III claim for declaratory judgment, concerned provisions of the Confidentiality Agreement. Because UAR obtained summary judgment on those claims, UAR was deemed entitled to recover its attorneys' fees and costs reasonably expended in defending against those two claims.

Hodak now challenges this ruling. First, he contends that his breach of contract claim involved the Employment Agreement, which does not include a fee-shifting provision, not the Confidentiality Agreement. Second, Hodak argues that UAR cannot be the prevailing party on the

claim for declaratory judgment that the Non-Competition Agreement is unenforceable because the district court made no finding that Hodak ever breached the Non-Competition Agreement.

The language of the fee-shifting provision is broad. The Count III claim for declaratory judgment directly challenged the enforceability of the Non-Competition Agreement and clearly implicates the fee-shifting provision. Additionally, UAR's primary defense in response to the Count II breach of contract claim, as adjudicated by the district court, was based on the Confidentiality Agreement. It is thus apparent that both claims concerned interpretation and enforcement of provisions of the Non-Competition, Confidential Information and Invention Agreement, which contains the mandatory fee-shifting provision. To this extent, both claims come within the scope of "any litigation or proceeding concerning any provision of this Agreement" and implicate recovery of attorneys' fees by the prevailing party.

However, because we have decided to vacate the summary judgment ruling on the breach of contract claim, UAR ceases to be the prevailing party on what the district court appropriately called the "central claim in this case." It follows that the order awarding attorneys' fees must be vacated as well and the matter of attorneys' fees deferred until after completion of proceedings on all pending claims in the district court, when the court can, in the exercise of its discretion, re-evaluate "prevailing party" status on a complete record.

**G. Dismissal of UAR's Counterclaims**

At the conclusion of its summary judgment opinion, the district court noted that UAR's counterclaims, the only remaining claims, appeared to suffer from some infirmities. In the interest of concluding the case, the court ordered UAR to show cause within ten days why the claims should

not be dismissed with prejudice. UAR responded by moving for voluntary dismissal without prejudice, which motion the court granted over Hodak's objection. The district court properly recognized that the question of dismissal with or without prejudice was committed to its sound discretion, citing *Grover by Grover v. Eli Lilly and Co.*, 33 F.3d 716, 718 (6th Cir. 1988). Hodak now contends the district court abused its discretion when it declined to dismiss the counterclaims *with* prejudice. In reviewing for abuse of discretion, we must uphold the district court's ruling unless we have a definite and firm conviction that it committed a clear error of judgment. *Harlamert v. World Finer Foods, Inc.*, 489 F.3d 767, 773 (6th Cir. 2007).

The district court's reasoning is clearly spelled out in its opinion. Citing the relevant factors discussed in *Grover*, the court noted that voluntary dismissal without prejudice is generally appropriate unless the opposing party would suffer "plain legal prejudice"—as opposed to facing the mere prospect of a second suit. *See Grover*, 33 F.3d at 718. In determining that Hodak would not suffer plain legal prejudice, the court acknowledged that Hodak had incurred expenses in defending against the counterclaims. Yet, the court recognized that UAR had filed the claims only in reaction to Hodak's suit against UAR. The court recognized that UAR had not in any way protracted proceedings on the counterclaims, but reasonably moved to dismiss them as soon as judgment was rendered on Hodak's claims. Further, the court resisted Hodak's invitation to scrutinize the merits of the counterclaims, observing that Hodak had forfeited his opportunity to timely move for summary judgment on the counterclaims and that assertion of such arguments in this context was "too little too late."

Hodak's appellate arguments are no different than those raised below and are adequately addressed in the district court's opinion. His arguments are not patently meritless; the district court, in the exercise of its discretion, could have elected to consider the merits of the counterclaims and potentially dismissed them with prejudice. Yet, because the district court was within its discretion in refusing to pass on the merits of the counterclaims, its refusal to dismiss them with prejudice was entirely appropriate. *See Warfield v. AlliedSignal TBS Holdings, Inc.*, 267 F.3d 538, 542 (6th Cir. 2001) (recognizing that voluntary dismissal with prejudice is equivalent to final adjudication on the merits). Moreover, the appropriateness of the district court's decision is magnified, considering that we are, by vacating the district court's award of summary judgment to defendants on Hodak's "central claim," partially nullifying the very action that triggered defendants' voluntary dismissal of the counterclaims in the first place. In sum, Hodak's arguments fall far short of persuading us that dismissal without prejudice results in unfair treatment amounting to "plain legal prejudice" or otherwise represents an abuse of discretion. The district court's ruling must therefore be affirmed.

## H. Denial of Attorneys' Fees on Counterclaims

Notwithstanding the dismissal of the counterclaims without prejudice, Hodak insists he is the "prevailing party" on those claims and therefore entitled to recovery of attorneys' fees under the fee-shifting provision in the Confidentiality Agreement. Applying the ordinary meaning of "prevailing party," the district court denied Hodak's motion for attorneys' fees because the dismissal without prejudice did not effect a "judicially sanctioned change in the legal relationship of the parties." Memorandum Opinion pp. 3-6, dist. ct. dkt. no. 149 (citing *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 605 (2001)).

Hodak does not directly challenge the district court's enforcement of the ordinary meaning of "prevailing party," but cites case law recognizing the court's discretion to award attorneys' fees to the defendant as a condition of granting a motion for voluntary dismissal without prejudice. Again, the district court had discretion to award attorneys' fees in conjunction with the voluntary dismissal, but its refusal to do so has not been shown to be an abuse of discretion. The order denying Hodak attorneys' fees on the counterclaims is affirmed.

### III.  CONCLUSION

For the reasons set forth above, we find that the record evidence poses triable fact issues on Hodak's breach of contract claim. Accordingly we **VACATE** the district court's summary judgment ruling on the breach of contract claim and **VACATE** the district court's award of attorneys' fees and costs to UAR as prevailing party. In all other respects, the district court's rulings are **AFFIRMED**. The case is **REMANDED** for further proceedings not inconsistent with this opinion.